UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

DATAFLOW, INC.; DATAFLOW, LLC;
and DATAFLOW REPROGRAPHICS,
LLC,

                       Plaintiffs,

        -against-                                  3:11-CV-1127 (LEK/DEP)

PEERLESS INSURANCE CO.,

                       Defendant.

_____

**MEMORANDUM-DECISION and ORDER**

**I.    INTRODUCTION**

This matter, which arises out of a dispute regarding an insurance contract, returns to the Court on Plaintiffs Dataflow, Inc. ("Dataflow Inc."), Dataflow, LLC ("Dataflow LLC"), and Dataflow Reprographics, LLC's ("Reprographics") (collectively, "Plaintiffs"), and Defendant Peerless Insurance Co.'s ("Defendant") Motions for summary judgment. Dkt. Nos. 56 ("Defendant's Motion"); 56-36 ("Defendant's Memorandum"); 58 ("Plaintiffs' Motion"); 58-18 ("Plaintiffs' Memorandum"). Both sides filed Responses, and each replied. Dkt. Nos. 66 ("Defendant's Response"); 69 ("Plaintiffs' Response"); 79 ("Plaintiffs' Reply"); 81 ("Defendant's Reply"). For the following reasons, the Court grants in part and denies in part each Motion.

**II.    BACKGROUND**

The material facts of this case are not in dispute. Dataflow Inc., Dataflow LLC, and Reprographics are three related legal entities under the same ownership. Dkt. No. 58-1 ("Plaintiffs' SMF") ¶ 7. Dataflow LLC and Reprographics are the product of smaller businesses acquired by Dataflow Inc. and then reincorporated separately. Id. ¶¶ 8-11. The businesses jointly engage in

blueprint and microfilm services in New York and northern Pennsylvania. Dkt. No. 58-6 ("McCormick Affidavit") ¶ 2.

Plaintiffs hired Brian Steele ("Steele") to work in their accounting department in 2000. Pls.' SMF ¶ 13. Steele was promoted to Manager of Accounting of all three entities in 2005. Id. ¶ 14. Plaintiffs claim that Steele, while he held the Manager of Accounting position, stole approximately $1.2 million[1] from Plaintiffs' accounts through various means, including: (1) forging the owners' signature on checks; (2) creating an electronic version of an owner's signature to endorse checks for his personal benefit; (3) signing his own name to negotiate Plaintiffs' checks; (4) directing Plaintiffs' funds directly to his personal accounts using electronic automated clearinghouse transfers; (5) taking money from Plaintiffs' petty cash stores; (6) falsely claiming overtime hours and unused vacation time as time worked; and (7) using Plaintiffs' corporate credit cards to make personal purchases. Id. ¶¶ 20-30. Plaintiffs discovered this series of larcenies in March 2010 when Steele took a medical leave of absence. McCormick Aff. ¶ 20. Steele was promptly fired and charged with felony grand larceny and forgery, to which he pleaded guilty. Id. ¶¶ 20-21.

Some employees perform work for all three Dataflow entities, including the entire accounting department; these employees are compensated through a master account held by Dataflow Inc. Id. ¶ 8. Dataflow Inc., Dataflow LLC, and Reprographics all contribute funds to the master account that are then paid out to employees in a single paycheck. Id. ¶¶ 8-9; see also Dkt No. 58-7 ("McCormick Exhibits") at Exs. 1a, 2, 3. While Steele was a Dataflow employee, his salary was drawn from this master account. McCormick Aff. ¶¶ 8-9. A handful of employees only

---

[1] Defendant asserts that Steele actually stole $946,302.78, the amount that he admitted to stealing in his criminal proceeding. Dkt. No. 67 ("Defendant's Response SMF") ¶ 20.

2

perform work for either Dataflow LLC or Reprographics and are therefore compensated by one paycheck bearing the respective entity's name. Def.'s Resp. SMF ¶ 18.

In October 2007, Plaintiffs bought insurance policies from Defendant for each of the three Dataflow entities. Pls.' SMF ¶ 1. The policies each lasted one year and covered, *inter alia*, loss resulting from employee dishonesty and theft. Id. ¶¶ 1-3, 5. The maximum recovery for each instance of employee dishonesty on each policy was $25,000 for Dataflow LLC and Reprographics, and $75,000 for Dataflow Inc. Def.'s SMF ¶ 23. Plaintiffs purchased identical policies in October 2008, and again in October 2009. Pls.' SMF ¶¶ 2-3. After discovering Steele's theft, Plaintiffs filed claims with Defendant seeking coverage for their loss. Id. ¶ 34. Defendant denied Plaintiffs' claims except for one instance of theft from Dataflow, Inc., and paid out the $75,000 maximum for that instance. Id. ¶ 43. Plaintiffs then commenced this action in New York Supreme Court, Broome County, and Defendant removed the action to the Northern District of New York. Dkt. No. 1 ("Removal Petition").

## III.  LEGAL STANDARD

### A. Summary Judgment

Summary judgment is proper where "there is no genuine issue as to any material fact," and "the movant is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist., 673 F.3d 84, 94 (2d Cir. 2012). If the moving party will not bear the burden at trial, it may, in order to meet its summary-judgment burden of production, either: (1) "submit affirmative evidence that negates an essential element of the nonmoving party's claim"; or (2)

3

"demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." Celotex, 477 U.S. at 330-32 (Brennan, J., dissenting). If the moving party carries its burden of production, the nonmoving party must raise some genuine issue of material fact; "metaphysical doubt as to material facts" is not enough. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). However, the burden of persuasion remains at all times with the moving party, who must affirmatively demonstrate entitlement to judgment as a matter of law. Celotex, 477 U.S. at 332.

### B. Insurance Contract Coverage Disputes[2]

Under New York law, insurance contract disputes are treated as breach of contract claims, with some caveats. See MBIA Inc. v. Fed. Ins. Co., 652 F.3d 152, 158 (2d Cir. 152); Morgan Stanley Grp., Inc. v. New Eng. Ins. Co., 225 F.3d 270, 275 (2d Cir. 2000). To the extent the parties' intent cannot be clearly inferred from the writing of a contract, terms are to be interpreted "according to common speech and consistent with the reasonable expectations of the average insured." Cragg v. Allstate Indem. Corp., 950 N.E.2d 500, 501 (N.Y. 2011). If any ambiguities in the contract terms remain, they must be resolved in favor of coverage. Thomas J. Lipton, Inc. v. Liberty Mut. Ins. Co., 314 N.E.2d 37, 39 (N.Y. 1974).

## IV. DISCUSSION

This action centers on several terms in the operative insurance Policies issued by Defendant

---

[2] The Court's subject-matter jurisdiction over this action arises out of diversity of the parties. Dkt. No. 1-1 at 1-2 (citing 28 U.S.C. § 1332). When a federal court sits in diversity, it applies federal procedural law and the substantive law of the state in which the court sits. See Gasperini v. Ctr. for Humanities, 518 U.S. 415, 427 (1996). Although a choice-of-law analysis under New York law might otherwise be required, in light of the parties' agreement that New York law should apply, see generally Pls.' Mem.; Def.'s Mem., the Court shall simply apply New York's rules for construction of insurance contracts.

4

to Plaintiffs. The parties disagree on: (1) whether Steele was an "employee" of Dataflow LLC and Reprographics; (2) whether Steele's scheme to steal and divert money from Plaintiffs' account constitutes one or multiple instances of employee dishonesty; (3) whether Plaintiffs' losses would nevertheless have been covered under other provisions of the Policies; and (4) whether other terms of the Policies limit Plaintiffs' recovery.

### A. "Employee" and "Direct" Compensation

Under the section of the Policies entitled "Employee Dishonesty," Defendant states that it:

> will pay for direct loss of or damage to Business Personal Property, including 'money' and 'securities,' resulting from dishonest acts committed by any of your employees acting alone or in collusion with other persons (except you or your partner) with the manifest intent to: (a) Cause you to sustain loss or damage; and also (b) Gain financial benefit (other than salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions or other employee benefits earned in the normal course of employment) for: (i) Any employee; or (ii) Any other person or organization.

McCormick Ex. 13a at 93-94. The policies define an "employee," in relevant part, to be

> Any natural person: (i) While in your service (and for 30 days after termination of service); and (ii) Whom you compensate directly by salary, wages or commissions; and (iii) Whom you have the right to direct and control while performing services for you.

Id. at 94. Defendant argues that Steele was not directly compensated by Dataflow LLC and Reprographics, and thus he was not their employee under the policies. Def.'s Mem. at 7-13. Plaintiffs argue that because Dataflow LLC and Reprographics contributed to the joint bank account from which Steele's salary was drawn, he qualifies as their employee under the policies. Pls.' Mem. at 7-10.

Whether Steele actually qualifies as an employee of Dataflow LLC and Reprographics turns on whether contributions to the Dataflow Inc.-held bank account can constitute "direct compensation" under the Policies. Defendant cites a case from another jurisdiction finding that the

5

inclusion of "direct" in an insurance policy's definition of "employee" excludes as employers entities that make transfer payments to another company for an individual's services. See T.S.I. Holdings, Inc. v. Buckingham, 885 F. Supp. 1457, 1464 (D. Kan. 1995). Plaintiffs, on the other hand, cite cases from within New York that involved insurance policies not including the word "direct." See Gross Veneer Co. v. Am. Mut. Ins. Co., 424 N.Y.S.2d 743, 743 (App. Div.1980); 175 Check Cashing Corp. v. Chubb Pac. Indem. Grp., 464 N.Y.S.2d 118, 120 (App. Div. 1983); Fortunoff Silver Sales, Inc. v. Hartford Accident & Indem. Co., 459 N.Y.S.2d 866, 866-67 (App. Div.1983).

Defendant maintains that T.S.I. Holdings is not meaningfully distinguishable from the instant case, and that the Court should hold that Steele was not Dataflow's employee. Def.'s Mem. at 10-13. In that case, an employee of a parent corporation was responsible for the finances of the corporation's wholly owned subsidiaries. 885 F. Supp. at 1460. In return, the subsidiaries paid a management fee to the parent corporation, which ostensibly was deposited into the corporation's general funds. Id. The employee then embezzled money from a subsidiary, and both the parent and subsidiary sued their insurance provider for failing to reimburse their losses. Id. The Court held that the management fee did not constitute a "direct" payment to the employee, and therefore its losses were not recoverable under the policy. Id. at 1464. Defendant reads this holding to mean generally that any arrangement other than an immediate transfer from a company's bank account to the individual precludes that individual from being an "employee" under the terms of the policy. Def.'s Mem. at 8-9.

In other contexts, courts have examined the degree of control that a corporation retains over funds paid to an individual through another entity to determine whether that payment was direct.

6

See, e.g., United States v. Fred A. Arnold, Inc., 573 F.2d 605, 608 (9th Cir. 1978) ("In our opinion, in order to be direct payment the payor must have (1) the ability to control the funds, and (2) the right and legal authority to exercise that control."); United States v. Kennedy Construction Co. of NSB, Inc., 572 F.2d 492 (5th Cir. 1978) (holding that whether a payment was "direct" for purposes of a suit under 26 U.S.C. § 3505 depended on control that contractor retained over bank accounts used to pay employees). Courts adopting this approach have taken various factors into account, such as: who deposited the funds; whether any entity had the ability to control the funds after they were deposited; whether that control was actually exercised; whether checks needed to be co-signed; and how relevant financial statements were prepared. See, e.g., Derr v. United States, 498 F. Supp. 337, 339-40 (W.D. Wis. 1980) (collecting cases).

The Court finds the categorical rule that Defendant seeks to impose to be overly broad. It cannot be the case that the simple combination of funds to create a single paycheck—rather than three separate checks—itself is enough to deem compensation not "direct." Furthermore, the control approach adopted in other courts is not inconsistent with T.S.I. Holdings. In that case, there was no evidence that the subsidiary companies retained any control over the management fee that they paid to the parent company. See generally 885 F. Supp. at 1457. The management fee was simply treated by the parent company as revenue; it was not set aside as wages or otherwise segregated. Id. at 1463-64. Therefore, it was clear that the subsidiaries did not make a "direct" payment to the parent company's employee.

However, application of the "degree-of-control" rule does not entirely resolve whether Steele was an employee of all three Dataflow entities. The issue is further complicated by the fact that Defendant sold stock insurance policies, the meanings of which appear ambiguous due to the unique

7

nature of the Dataflow entities' legal and business structure. Plaintiffs claim that the three corporate entities that comprise Dataflow are "run as a single business unit." McCormick Aff. ¶ 4. Together, the three entities have between fifty and sixty employees, some of whom are employed by one entity, and others of whom are "employed"—in the colloquial meaning of the word—by all three. Id. ¶¶ 3, 8-9. The employees of multiple Dataflow entities are paid from a master account in Dataflow, Inc.'s name. Id. ¶ 8. Plaintiffs state, and support with accounting records, that each Dataflow entity "directly contributed to payment of their portions of these salaries by transferring their funds to the Dataflow, Inc. master account," for accounting purposes the salaries of joint employees were apportioned to each Dataflow entity "based upon its respective monthly sales." Id.; McCormick Exs. 1-3. The salaries are itemized not by employee, but by department: for instance, each Dataflow entity paid a portion of the accounting department's collective salary, as all accounting employees worked for all three companies. Id. ¶ 10, McCormick Exs. 1- 2. The funds from those accounts went directly from the three Dataflow entities to the master account and onto the employees. See McCormick Aff. ¶¶ 8-10; McCormick Exs. 1-3.

The gravity of the analysis is that the form insurance policy's definition of "employee" is so ill-suited to Dataflow's corporate structure that it must be deemed ambiguous. To hold otherwise would, in essence, make bargained-for insurance coverage inoperative to cover larcenies from Dataflow LLC and Reprographics by those individuals best positioned to commit them: the accounting department. According to New York law, ambiguities in insurance contracts are resolved in favor of coverage. Thomas J. Lipton, 314 N.E.2d at 39. The Court finds further support for this resolution in the tightrope that Defendant walks in simultaneously seeking to deny coverage under both the Employee Dishonesty extension and other sections of the Policy. Compare Def.'s Mem. at

5-13 with id. at 28-33. Defendant claims that although Steele was not an "employee" of Dataflow LLC and Reprographics in his role as their Manager of Accounting, his larcenies were committed in the capacity of the companies' "authorized representative." Id. Therefore, Dataflow's losses would be excluded under both the Employee Dishonesty section and the other Policy sections. No reasonable insured would purchase a policy expecting coverage to be denied in this fashion.[3]

Accordingly, the Court finds that funds pooled directly by multiple employers in a master account and paid out to employees, without further discretion or control exercised by the holder of the account, constitutes "direct" compensation, and therefore individuals paid in such a manner are "employees" for the purposes of the operative insurance policies. Furthermore, the Court finds that Plaintiffs have met their burden of production in showing that Steele was compensated in such a manner. Because Defendant, in response, has done no more than raise "metaphysical doubt as to the facts," Matsushita Elec. Indus., 475 U.S. at 586, the Court holds Steele to have been the employee of all three Dataflow entities, and thus Plaintiffs are entitled to coverage consistent with that finding.

**B. Instances of Employee Dishonesty**

The parties next dispute whether the series of larcenies committed by Steele constitute one or multiple acts of employee dishonesty. The insurance contract provides: "(4) All loss or damage: (a) Caused by one or more persons; or (b) Involving a single act or series of related acts; is

---

[3] In addition to New York law's mandate to resolve ambiguities in favor of insurance coverage, such resolution is further supported by the Court's January 2014 Memorandum-Decision and Order. Dkt. No. 52 ("January Order"). The January Order granted Plaintiffs an adverse inference instruction in light of Defendant's spoliation of evidence of internal emails regarding Plaintiffs' insurance claims and the underlying Policies because the Court found that Defendant's internal emails were likely to contain information regarding Defendant's own interpretation of the contract. Jan. Order at 6-7. This evidence of interpretation could, potentially, be relevant to whether Steele was an employee of all three entities.

9

considered one occurrence." Def.'s Mem. at 21.[4] Defendant argues that because Steele's acts of larceny are a "series of related acts," they constitute a single occurrence and, accordingly, Defendant's invocation of the $75,000 limit for a single occurrence was proper.

New York courts have not previously construed the meaning of a "series of related acts" for the purposes of employee dishonesty insurance coverage. See Pls.' Mem. at 10; Def.'s Mem. at 22. However, New York has adopted an "unfortunate events" test for determining the meaning of an occurrence in other contexts. See Arthur A. Johnson Corp. v. Indem. Ins. Co. of N. Am., 164 N.E.2d 704, 708 (N.Y. 1959). The "unfortunate events" test examines "whether there is a close temporal and spatial relationship between the incidents giving rise to injury or loss, and whether the incidents can be viewed as part of the same causal continuum, without intervening agents or factors." Appalachian Ins. Co. v. Gen. Elec. Co., 863 N.E.2d 994, 999 (N.Y. 2007). The Court of Appeals justified that such a rule "corresponds most with what the average person anticipates when he buys insurance and reads the limitation in the policy." Arthur A. Johnson, 164 N.E.2d at 708.

In adopting that test, the Court rejected tests equating an occurrence with a "sole proximate cause." Id. at 708; see also Roman Catholic Diocese of Brooklyn v. Nat'l Union Fire Ins. Co. of Pittsburgh, 991 N.E.2d 666, 672 (N.Y. 2013). Despite New York's unqualified rejection of the sole proximate cause test, Defendant argues that it should nevertheless apply in light of the language in

---

[4] Although the parties do not make their arguments based upon part (a) of the quoted paragraph, the Court notes that that part of the quoted provision is nonsensical as written. Taking the word "or" literally, part (a) reads: "All loss or damage . . . [c]aused by one or more persons . . . is considered one occurrence." Given that this provision appears in an employee dishonesty extension, a plain-language reading would have *any* loss from acts of employee dishonesty, even if they were completely unrelated, considered a single occurrence. This reading would render part (b) of the paragraph meaningless. However, because the parties seem to ignore part (a), the Court declines to consider the effect of that part on the interpretation of the remainder of the paragraph.

10

the policy at issue. Def.'s Mem. at 22-27. First, this argument is belied by Defendant's reliance on cases involving policy language significantly different than the contract at issue in this case. See, e.g., Aldridge Elec., Inc. v. Fid. & Deposit Co. of Md., No. 04 C 4021, 2008 WL 4287639, at *5 (N.D. Ill. Sept. 10, 2008) (examining a policy stating that "[o]ccurrence means all loss caused by, or involving, one or more 'employees,' whether the result of a single act or series of acts"). Second, policy language defining an occurrence as "a series of related acts," without further clarification, does not somehow mean that the Court should completely abandon New York's test for determining whether the acts are related. Indeed, the "unfortunate events" test is essentially a framework for determining whether or not separate acts causing the harm were sufficiently related such that they could be considered one occurrence. Finally, there is no reason to believe that New York courts would adopt the test that they have rejected in other contexts specifically for employee dishonesty, nor is there reason for an insured to expect that treatment when she purchases an insurance contract.

The parties' affidavits and exhibits present insufficient evidence by which to judge whether or not Steele's actions satisfied the elements of the "unfortunate events" test, and therefore were related enough to constitute one or multiple occurrences. See, e.g., Pls.' SMF ¶¶ 20-33; Def.'s Resp. SMF ¶¶ 20-33. More specifically, although Plaintiffs have adduced evidence that Steele acted dishonestly and caused loss, they have not shown either a lack of temporal and spatial nexus between Steele's actions, or the nonexistence of a "causal continuum" as New York has defined that term, Appalachian Ins. Co., 863 N.E.2d at 999. See generally Pls.' SMF. Accordingly, both parties' Motions are denied to the extent they seek judgment on the number of occurrences of employee

dishonesty for which Plaintiffs are entitled to coverage.[5]

**C. Effect of Policy Renewals**

Plaintiffs further argue that, for single occurrences worth more than $75,000 that span multiple Policy renewal periods, the coverage limits must be applied separately to the losses sustained in each of the two coverage periods rather than combined. Pls.' Mem. at 19-23.

Courts that have analyzed this issue are divided on whether a single occurrence spanning multiple coverage periods may be split between the respective coverage limits. Some courts have held that the renewal of coverage simply allows an insured to claim losses sustained in each coverage period; a single occurrence still triggers one coverage limit. See, e.g., Madison Materials Co. v. St. Paul Fire & Marine Ins. Co., 523 F.3d 541, 544-46 (5th Cir. 2008). Other courts have held that the coverage limit language is ambiguous and that, even if multiple instances of dishonesty spanning several coverage periods are one occurrence, coverage limits may be applied on a year-by-year basis depending on when the losses were sustained. See, e.g., Karen Kane Inc. v. Reliance Ins. Co., 202 F.3d 1180, 1188 (9th Cir. 2000); Spartan Iron & Metal Corp. v. Liberty Ins. Corp., 6 F. App'x 176, 180 (4th Cir. 2001). Each of these courts analyzed the language in the operative

---

[5] If this matter proceeds to trial, the number of occurrences of employee dishonesty that trigger coverage under the policy is a "a legal question for courts to resolve." Roman Catholic Diocese, 991 N.E.2d at 672 (citing Hartford Accident & Indem. Co. v. Wesolowski, 305 N.E.2d 907, 909 (N.Y. 1973). The dispositive motion deadline in this action was February 12, 2014. See generally Docket. However, because resolution of this issue of law will simplify any trial, the Court will allow the parties to make additional motions, within thirty days of the date of this Memorandum-Decision and Order ("MDO"), solely on the issue of how many occurrences of employee dishonesty Michael Steele engaged in consistent with the framework identified in this MDO.

12

insurance contract, all of which contained language similar or identical to the Policies.[6] Madison Mats., 523 F.3d at 545; Karen Kane, 202 F.3d at 1188; Spartan Iron & Metal, 6 F. App'x at 180.

The Court finds Plaintiffs' interpretation of the contract to be correct. The contract states only that the policy period is as defined in the Declarations, McCormick Ex. 13a at 106, which provide only that the policy period runs for one year from October 1 to the following October 1. McCormick Ex. 13a at 4. The Court agrees with Plaintiffs that the apparent purpose of this provision is to force insureds to account for losses sustained during one occurrence by assigning them on a year-by-year basis, rather than pooling limits from multiple coverage periods.[7] Defendant seemingly conflates the contract's limitation by occurrence with the limitation by policy period. But it is more likely, based upon the overall language of the policies discussed *supra*, as well as the language discussed *infra* limiting the period for discovery of a claim, that the Policies were intended to operate as independent contracts that each established a recovery limit. See Karen Kane, 202

---

[6] Here, each of the insurance contracts provides:

> We will only pay for loss or damage you sustain through acts committed or events occurring during the Policy Period. Regardless of the number of years this policy remains in force or the number of premiums paid, no Limit of Insurance cumulates from year to year or period to period.

McCormick Ex. 13a at 94.

[7] For example, Plaintiff's reading would still provide meaningful limitation in a situation where a single occurrence of employee dishonesty spanned two policy periods, but nearly all of the losses were sustained in one of those policy periods. Under an identical policy with a $75,000 coverage limit, an insured who lost $150,000 in an occurrence of employee dishonesty—with $140,000 of those losses coming during the second policy period—could not pool the $75,000 coverage limitations to recover all $150,000 of its losses. Rather, the company could only recover $75,000 of the $140,000 loss sustained during the second policy period, resulting in a total recovery of $85,000. This reading is also fully consistent with the language in Paragraph 9 of the Employee Dishonesty extension, quoted *infra*.

13

F.3d at 1187-88; Spartan Iron & Metal, 6 F. App'x at 180; Glaser v. Hartford Cas. Ins. Co., 364 F. Supp. 2d 529, 538 (D. Md. 2005). Accordingly, the Court grants Plaintiffs judgment on the issue that the coverage limitations apply on a per-contract basis, rather than singly over the entire course of an occurrence spanning multiple policy periods and insurance contracts.

### D. Coverage Under Other Provisions

To the extent their losses are not recoverable under the Employee Dishonesty extension of the insurance policy, Plaintiffs contend that other sections of the Policy including, *inter alia*, the "Forgery and Alteration" and "Money and Securities" sections, require Defendant to provide coverage. Pls.' Mem. at 14-19. However, because the Court found *supra* that Steele was Plaintiffs' employee, and those Policy sections exclude coverage for, *inter alia*, Plaintiffs' employees, see Def.'s Mem. at 29, the Court grants Defendant's Motion to the extent it seeks judgment that Plaintiffs are not entitled to coverage under sections of the insurance contract other than "Employee Dishonesty."

### E. Timeliness of Plaintiffs' Discovery of Steele's Larcenies

*1. Analysis*

Defendants further argue that the Policy's language bars Plaintiffs from recovering losses sustained before October 1, 2008, because the limitations period for discovering losses has lapsed. Def.'s Mem. at 13-20. The relevant terms of the contract are as follows:

> (7) We will pay only for covered loss or damage discovered no later than one year from the end of the Policy Period.
>
> (8) If you (or any predecessor in interest) sustained loss or damage during the period of any prior insurance that you could have recovered under that insurance except that the time within which to discover loss or damage had expired, we will pay for it under this Coverage Extension, provided: (a) This Coverage Extension became effective at the

14

time of cancellation or termination of the prior insurance; and (b) The loss or damage would have been covered by this Coverage Extension had it been in effect when the acts or events causing the loss or damage were committed or occurred.

(9) The insurance under paragraph (8) above is part of, not in addition to, the Limit of Insurance applying to this Coverage Extension and is limited to the lesser of the amount recoverable under: (a) This Optional Coverage as of its effective date; or (b) The prior insurance had it remained in effect.

McCormick Ex. 13a at 94.[8] Plaintiffs argue that Defendant's representations during its investigation and in its disclaimer letters waive any defense based on lapse of the limitations period. Pls.' Resp. at 6-11.

Based solely on the language of the contract, analyzed as a whole, the Court finds that Plaintiffs may only claim losses sustained on or after October 1, 2007.[9] Defendant's argument that Plaintiffs may recover only after October 1, 2008, seems to implicitly assume that the losses sustained between October 1, 2008, and October 1, 2009, are recoverable only under the insurance policy in effect the following year. This is not the case. The Policy in effect between October 1, 2008, and October 1, 2009, provides that it itself is the basis for coverage "for covered loss or damage discovered no later than one year from the end of the Policy Period." McCormick Ex. 14a at 94. The 2008-09 losses were discovered less than one year from October 1, 2009—"the end of the Policy Period"—and therefore they are covered under the contract. Under Defendant's reading

---

[8] This language remained constant in all of the subsequent Policies. See McCormick Exs. 14a, 15a.

[9] In drawing this conclusion, the Court is careful to consider the impact of the January Order's adverse inference instruction. Jan. Order. However, where the language of a contract is clear, analysis of such contracts should be confined to the four corners of the document. See, e.g., Hedgepeth v. Christensen, 989 N.Y.S.2d 894, 895 (App. Div. 2014) ("When the terms of a written contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving practical interpretation to the language employed and the parties' reasonable expectations.") (internal quotation marks omitted).

15

of the contract, the non-overlapping 2009-10 Policy would fully supersede the 2008-09 Policy and reduce Plaintiffs' ability to recover under that contract—an unreasonable result considering that there is no language in any of the Policies to suggest that subsequent renewals in any way abridge the ability to recover under previous policies. See generally McCormick Exs. 13a, 14a, 15a. Rather, the contract simply extends coverage into the following year while preserving an insured's rights to seek full recovery under the clear terms of the previous contract.

Accordingly, paragraphs 8 and 9 of the 2008-09 Policy allow recovery of losses occurring in the previous Policy Period. The 2008-09 Policy became effective upon the termination of the 2007-08 Policy. Compare McCormick Ex. 13a with McCormick Ex. 14a. Furthermore, the loss would have been recoverable under each of the two Policies "except that the time within which to discover loss or damage had expired." Accordingly, paragraph 8 authorizes coverage. Paragraph 9 then sets the amount of recovery. Because the 2007-08 and 2008-09 Policies contained identical coverage limits under the Employee Dishonesty extensions, separate occurrences of employee dishonesty are not affected by the language in Paragraph 9. However, single occurrences spanning both Policy Periods are subject to a single coverage limit because recovery is authorized solely by the 2008-09 policy.

However, there is no basis for the recovery of losses occurring before October 1, 2007, under the terms of the contract. Plaintiffs' arguments regarding the parties' subsequent behavior are irrelevant except on the issue of waiver, see Pls.' Resp. at 6-10, as the four corners of the document are clear. However, the Court must now analyze whether or not Defendant waived its ability to claim that the losses occurring before 2007 were time-barred.

*2. Waiver*

Plaintiffs argue that Defendant failed to raise the timeliness of the claims for losses occurring before October 1, 2007, in their denial-of-coverage letters, and that denial of coverage based on those grounds has therefore been waived. Id. In support, Plaintiffs cite cases in which New York courts have found that an insurer's failure to raise procedural defenses in its denial of coverage letter constitutes a waiver of those defenses in subsequent litigation. See State of N.Y. v. AMRO Realty Corp., 936 F.2d 1420, 1429-33 (2d Cir. 1991) (holding that insurance company waived ability to deny coverage based on insured's failure to comply with notice-of-occurrence requirement); Nestegg Fed. Credit Union v. Cumis Ins. Soc'y, Inc., 87 F. Supp. 2d 144, 148 (N.D.N.Y. 2000); Benjamin Shapiro Realty Co. v. Agric. Ins. Co., 731 N.Y.S.2d 453, 453 (App. Div. 2001). This doctrine "evolved because of courts' disfavor of forfeitures of the insured's coverage which would otherwise result where the insured breached a policy condition, as for instance failure to file a timely legal action." Nestegg Fed. Credit Union, 87 F. Supp. 2d at 148 (citing Albert J. Schiff Assocs., Inc. v. Flack, 417 N.E.2d 84, 87 (N.Y. 1980)). However, the waiver doctrine does not apply when there would otherwise be no coverage under the terms of the relevant policy; waiver cannot be used to create coverage where none would otherwise exist. Albert J. Schiff Assocs., 417 N.E.2d at 87 ("[W]here the issue is the existence or nonexistence of coverage (e.g., the insuring clause and exclusions), the doctrine of waiver is simply inapplicable.").

Here, the denial of coverage for loss occurring before October 1, 2007, is based not on procedural rules for filing a claim, but on the substantive terms of the Policy based on a company's internal discovery of employee misconduct. The source of that policy is within "the insuring clause and exclusions," rather the rules for filing a claim. Id. Accordingly, the Court finds that Defendant

cannot have waived the right to contest claims arising before October 1, 2007, because coverage for those claims never existed in the first place.

## V. SUMMARY OF REMAINING ISSUES

Consistent with this Memorandum-Decision and Order, the Court makes the following findings of law:

1. The Policies' definition of "employee" includes an individual whose salaries from multiple policyholders were pooled into a single account and directly paid out to him without further manipulation of the funds by any entity;

2. The Policies provide coverage up to the coverage limit for each occurrence of employee dishonesty as defined by New York's "unfortunate events" test;

3. Occurrences of employee dishonesty are subject to claim limits determined by the Policy providing the basis for the coverage. Accordingly, if multiple Policies provide coverage for a single occurrence, the losses "belonging to" each Policy are subject to their own coverage limit;

4. Aside from the Employee Dishonesty provision, no provisions of the Policies provide a basis for coverage;

5. Plaintiffs are entitled to coverage for verifiable losses occurring after October 1, 2007, and arising out of Steele's larcenies.

Furthermore, the Court holds that there is no genuine issue of material fact that Brian Steele was an employee of all three Dataflow entities during the entirety of the coverage period.

## VI. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that consistent with this Memorandum-Decision and Order, Defendant's Motion (Dkt. No. 56) for summary judgment and Plaintiffs' Motion for summary judgment (Dkt. No. 58) are each **GRANTED in part and DENIED in part**; and it is further

**ORDERED**, that **within thirty (30) days** of the date of this Memorandum-Decision and

Order, the parties may file additional summary judgment motions to resolve the issue of the number of occurrences of employee dishonesty consistent with the Court's findings in this Memorandum-Decision and Order; and it is further

**ORDERED**, that the Clerk of the Court serve this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED**.

DATED: September 30, 2014
Albany, New York

*[signature]*
Lawrence E. Kahn
U.S. District Judge