UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

DATAFLOW, INC., *et al*.,

Plaintiffs,

-against- 3:11-cv-1127 (LEK/DEP)

PEERLESS INSURANCE COMPANY,

Defendant.

**MEMORANDUM-DECISION and ORDER**

## I. INTRODUCTION

This insurance action returns to the Court on Defendant Peerless Insurance Company's ("Peerless") Motion for reconsideration of the Court's Memorandum-Decision and Order filed September 30, 2014. Dkt. Nos. 86 ("Motion"); 86-2 ("Memorandum"). Plaintiffs Dataflow, Inc. ("Dataflow Inc."), Dataflow, LLC ("Dataflow LLC"), and Dataflow Reprographics ("Reprographics") (collectively, "Plaintiffs") have opposed the Motion. Dkt. No. 89 ("Response"). For the following reasons, the Motion is denied.

## II. BACKGROUND

The Court recounts the background and procedural history of this action necessary to the disposition of the present Motion. For further background on the case, reference is made to the Court's September 30, 2014 Memorandum-Decision and Order. Dkt. No. 85 ("September Order").

The dispute arises from embezzlement committed by Plaintiffs' employee Brian Steele ("Steele"). Plaintiffs hired Steele to work in their accounting department in 2000, and in 2005, he was promoted to manager of accounting. Sept. Order at 2. Plaintiffs allege that while he was manager, Steele stole approximately $1.2 million from Plaintiffs' accounts through various means,

including: (1) forging the owners' signatures on checks; (2) creating an electronic version of an owner's signature to endorse checks for his own personal benefit; (3) signing his own name to negotiate Plaintiffs' checks; (4) directing Plaintiffs' funds directly to his personal accounts using electronic automated clearinghouse transfers; (5) taking money from Plaintiffs' petty cash stores; (6) falsely claiming overtime hours and unused vacation time as time worked; and (7) using Plaintiffs' corporate credit cards to make personal purchases. Id. Plaintiffs discovered Steele's larcenies in March 2010, and he was fired and charged with felony grand larceny and forgery, to which he pleaded guilty. Id.

In October 2007, Plaintiffs bought insurance policies from Defendant. Id. at 3. The policies each lasted one year and covered, *inter alia*, loss resulting from employee dishonesty and theft. Id.[1] The maximum recovery for each instance of employee dishonesty on each policy was $25,000 for Dataflow LLC and Reprographics, and $75,000 for Dataflow Inc. Id. Plaintiffs purchased identical policies in October 2008 and October 2009. Id. Plaintiffs filed claims on the policies to recover for Steele's theft. Id. Defendant denied Plaintiffs' claims, except for one instance of theft from Dataflow Inc., for which it paid out the $75,000 maximum. Id.

Plaintiffs commenced the present action in New York Supreme Court, Broome County, and Defendant removed the action to the Northern District of New York. Dkt. No. 1. Plaintiffs and Defendant both moved for summary judgment. Dkt. Nos. 56; 58. In its September Order, the Court

[1] The policies state that Defendant "will pay for direct loss or damage to Business Personal Property, including 'money' and 'securities' resulting from dishonest acts committed by any of your employees acting alone or in collusion with other persons (except you or your partner) with the manifest intent to: (a) Cause you to sustain loss or damage; and also (b) Gain financial benefit (other than salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions or other employee benefits earned in the normal course of employment) for: (a) Any employee; or (b) Any other person or organization." Dkt. No. 58-8 at 93-94.

granted and denied those Motions in part. Sept. Order at 18. One of the issues addressed by the Court was whether Steele's larcenies constituted a single or multiple instances of employee dishonesty. Id. at 5. In relevant part, the Court found that "the Policies provide coverage up to the coverage limit for each occurrence of employee dishonesty as defined by New York's 'unfortunate events' test." Id. at 18.

## III. LEGAL STANDARD

A motion for reconsideration may be granted where there is "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent a manifest injustice." Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP, 322 F.3d 147, 167 (2d Cir. 2003) (quoting Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd., 956 F.2d 1245, 1255 (2d Cir. 1992)). "The standard for granting a motion for reconsideration 'is strict and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court.'" Advanced Fiber Techs. Trust v. J&L Fiber Servs., Inc., 751 F. Supp. 2d 348, 382-83 (N.D.N.Y. 2010) (Kahn, J.) (quoting Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995)). "[R]econsideration 'should not be granted where the moving party seeks solely to relitigate an issue already decided.'" Id. at 383 (quoting Shrader, 70 F.3d at 257).

## IV. DISCUSSION

Defendant requests that the Court: (1) reconsider its holding that the number of instances of employee dishonesty is governed by the unfortunate events test; (2) vacate its ruling in footnote five that "the number of occurrences of employee dishonesty that trigger coverage under the policy is 'a

legal question for courts to resolve'"; and (3) clarify that footnote seven is not an example of how coverage limits would apply to a single occurrence of employee dishonesty spanning two policy periods. Mem. at 1-2.

**A. Unfortunate Events Test**

The policies state that "[a]ll loss or damage: (a) Caused by one or more persons; or (b) Involving a single act or series of related acts; is considered one occurrence." Dkt. No. 58-8 at 94. In its Motion for summary judgment, Defendant argued that Steele's acts of larceny were a "series of related acts," and so constitute a single occurrence. Dkt. No. 56-36 at 21. The Court accordingly had to interpret the meaning of a "series of related acts."

Although New York courts have not previously construed the meaning of a "series of related acts" in the context of an employee dishonesty provision,[2] the Court followed the "unfortunate events" test adopted by New York courts for determining the meaning of occurrence in other contexts. Sept. Order at 10. The unfortunate events test examines "whether there is a close temporal and spatial relationship between the incidents giving rise to injury or loss, and whether the incidents can be viewed as part of the same causal continuum, without intervening agents or factors." Appalachian Ins. Co. v. General Elec. Co., 8 N.Y.3d 162, 171-72 (N.Y. 2007). The unfortunate events approach "is based not solely on the cause but the nature of the incident giving rise to damages." Id. at 170-71. In Arthur A. Johnson Corp. v. Indemnity Insurance Co. of North America, 7 N.Y.2d 222, 225-26 (N.Y. 1959), the Court of Appeals considered whether there was one accident or two accidents where two separate temporary walls collapsed during a heavy rain

[2] The Court's subject-matter jurisdiction over this action arises from the diversity of the parties. Sept. Order at 4 n.2. Because the parties agree that New York law governs, the Court has applied New York law. Id.

storm. The Court of Appeals explained that under the unfortunate events test there were two accidents:

> [W]e need only point out that it is agreed that, during a heavy rainfall, a protecting wall collapsed under the water pressure and destruction poured into a building. Almost an hour later, another wall gave way and water flooded into another building. There is no suggestion that the collapse of the first wall caused the failure of the second. . . . In addition, the catastrophe was not the rain—that, in itself, did no harm. It was the breach of the wall letting the rain water in.

Id. at 230. The Arthur A. Johnson Court rejected an alternative approach that would have looked at whether the accident had one or more proximate causes. Id. at 226. Under that approach, the defendant insurance company had argued that because there was only one proximate cause of the accident— the heavy rainfall—there was therefore only one accident. Id.

The Court considered Defendant's argument that it should reject the unfortunate events test in favor of a proximate cause test. Sept. Order at 10-11. Defendant relied on out-of-jurisdiction authority holding that a continuing pattern of larcenies committed by an employee constitutes a single occurrence under a employee dishonesty provision. See Dkt. No. 56-36 at 22-28 (citing, *inter alia*, Aldridge Elec., Inc. v. Fid. & Deposit Co. of Md., No. 04 C 4021, 2008 WL 4287639 (N.D. Ill. Sept. 10, 2008)). Defendant offered that these cases provided guidance on how the Court should interpret a "series of related acts." The Court rejected Defendant's argument, finding that the cases cited to by Defendant involved significantly different policy language than the language at issue. Sept. Order at 11. The Court also found that the policy language—a "series of related acts"—did not compel the Court to abandon New York's test for determining whether acts are related and that there was "no reason to believe that New York courts would adopt the test that they have rejected in other contexts specifically for employee dishonesty." Id.

Defendant now argues that the Court erred in adopting the unfortunate events test in light of the Second Circuit's decision in World Trade Center Properties, L.L.C. v. Hartford Fire Insurance Co., 345 F.3d 154 (2d Cir. 2003). Mem. at 4-5. Defendant argues that World Trade Center articulates that the unfortunate events test is not applicable to first-party insurance coverage disputes, such as the case at hand. Id. Defendant's reliance on World Trade Center as "controlling precedent" overlooked by the Court is misplaced. Id. at 7.

In relevant part, World Trade Center considered whether the undefined use of the term "occurrence" was unambiguous as a matter of law due to New York precedent establishing a uniform meaning of the term. 345 F.3d at 180. The background of the case is as follows. The plaintiffs—the lease holders of the World Trade Center—engaged an insurance broker to set up a multi-layered insurance program covering the properties. Id. at 159. The defendant insurers had all bound coverage on various layers, but negotiations were ongoing regarding participation in the program and none had issued a final policy when the events of September 11, 2001 occurred. Id. at 160. Litigation ensued between the lease holders and the insurers. Id. at 158-59. The "broad question presented" was "whether the events of September 11, 2001 constituted one or two 'occurrences.'" Id. at 158.

The lease holders moved for summary judgment against Travelers Indemnity Company ("Travelers") arguing that the events of September 11th constituted two occurrences as a matter of law under the undefined term "occurrence" in Travelers' insurance policy. Id. at 159.[3] The issue before the Second Circuit was "whether the term 'occurrence' has such a clear and unambiguous

[3] The Second Circuit determined that Travelers' obligations were governed by a temporary insurance binder issued while negotiations were ongoing. 345 F.3d at 183.

meaning that the trier of fact should be barred from considering the available extrinsic evidence concerning the meaning the parties gave to that term when they were negotiating." Id. at 181.

The lease holders asserted that "occurrence" was unambiguous because there "is a clear and uniform meaning" of occurrence under New York law, relying on Arthur A. Johnson and its progeny. Id. at 186. The Second Circuit rejected the contention that there was a single uniform definition of "occurrence" under New York law. Id. at 189. Specifically, the Second Circuit found that Arthur A. Johnson and the other cases relied upon by the lease holders were third-party liability insurance cases and therefore involved "different interests" than a first-party insurance case. Id. at 186-87. For example, in a third-party liability case, "there is no reason to look any further back in the chain of causation than to the insured's acts of negligence, because it is the insured's negligence that triggers liability." Id. at 187. Moreover, "construction of the term 'occurrence' in a liability insurance context is influenced by the public policy concern of ensuring adequate compensation for injured third-parties who are not parties to the insurance contract." Id. In a first-party case, by contrast, "the insured's negligence is not at issue; rather, the policy insures against external perils such as fires, floods, and intentional acts that cause damage to the insured's property, and against which a property interest holder can take adequate measures to protect his investment." Id. at 188. Therefore, "a court's construction of the undefined term 'occurrence' . . . as intended by the parties for use in the third-party context is not necessarily applicable in the context of first-party insurance." Id. The Second Circuit therefore found that the meaning of "occurrence" in Travelers' binder was "sufficiently ambiguous" to preclude the lease holders' motion for summary judgment and permit consideration of extrinsic evidence of the parties' intentions. Id. at 190.

Defendant's reliance on World Trade Center is misguided. First, although Defendant

presents World Trade Center as "controlling precedent," Mem. at 7, the opinion does not hold what Defendant claims. The Second Circuit's holding was that the meaning of the term "occurrence" in Travelers' binder was sufficiently ambiguous to permit consideration of extrinsic evidence of the parties' intent; the Second Circuit did not, as Defendant suggests, decide the issue of whether the unfortunate events test applies in the context of a first-party insurance dispute. World Trade Center, 345 F.3d at 189. The discussion of the differences between first- and third-party insurance was dicta. See id. at 187-88. Moreover, as dicta, the Second Circuit merely stated that the unfortunate events test "is *not necessarily* applicable" to first-party insurance cases. Id. at 188 (emphasis added).

Second, World Trade Center involved circumstances, unlike the present case, that supported finding that the parties' use of the term "occurrence" was ambiguous and not governed by the test articulated by the New York Court of Appeals. "The cardinal principle for the construction and interpretation of insurance contracts—as with all contracts—is that the intentions of the parties should control. . . . [T]he meaning of particular language found in insurance policies should be examined in light of the business purposes sought to be achieved by the parties and the plain meaning of the words chosen by them to effect those purposes." Newmont Mines Ltd. v. Hanover Ins. Co., 784 F.2d 127, 135 (2d Cir. 1986) (internal quotation marks omitted). In World Trade Center, the Second Circuit considered the meaning of the undefined term "occurrence" in a temporary insurance binder. 345 F.3d at 183. Notably, a binder is "incomplete." Id. at 184 (noting that "extrinsic evidence is admissible to determine the parties' intentions with respect to the incomplete and unintegrated terms of a binder"). Moreover, as Plaintiffs persuasively argue, the binder in World Trade Center was "heavily negotiated between sophisticated commercial entities

and . . . effected interim coverage for a huge commercial risk." Resp. at 3. In the present case, by contrast, the policies are form policies, which define "occurrence" as a "series of related acts." As the Court has previously stated, "the 'unfortunate events' test is essentially a framework for determining whether or not separate acts causing the harm are sufficiently related such that they would be considered one occurrence." Sept. Order at 11. Furthermore, the Court found no reason for Plaintiffs to expect that the Court would reject the unfortunate events test. Id. Accordingly, World Trade Center does not warrant reconsideration of the Court's adoption of the unfortunate events test.

Defendant also argues that the unfortunate events test should only apply "absent policy language indicating an intent to aggregate separate incidents into a single occurrence." Mem. at 4 (quoting Roman Catholic Diocese of Brooklyn v. Nat'l Union Fire Ins. Co. of Pittsburgh, 21 N.Y.3d 139, 148 (N.Y. 2013)). However, the Court has already considered this argument and determined that the policy language does not compel the Court to abandon the unfortunate events test. Sept. Order at 11. Therefore, this argument is not an appropriate ground for reconsideration.

**B. Number of Occurrences**

Defendant next requests that the Court vacate its ruling in footnote five that "the number of occurrences of employee dishonesty that trigger coverage under the policy is 'a legal question for courts to resolve.'" Mem. at 1. In context, the Court found that there was "insufficient evidence to judge whether or not Steele's actions satisfied the elements of the 'unfortunate events' test, and therefore were related enough to constitute one or multiple occurrences." Sept. Order at 11. The Court therefore denied both parties' Motions to the extent they sought summary judgment on the number of occurrences of employee dishonesty. Id. The Court granted the parties leave to make

additional motions on the issue under the unfortunate events test. Id. at 12 n.5.

Defendant has not identified any error in the Court's statement, which quotes Roman Catholic Diocese. The full quotation from Roman Catholic Diocese is that "[g]enerally, the issue of what constitutes an occurrence has been a legal question for courts to resolve." Roman Catholic Diocese, 21 N.Y.3d at 148. If there are no genuine issues of material fact as to the number of occurrences, then summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Defendant does not assert any factual disputes, but may do so on the parties' additional motions on the issue. Finally, Defendant's citations to World Trade Center and Newmont Mines are inapposite as neither of those cases holds that the Court cannot determine the number of occurrences as a matter of law. In World Trade Center, the Second Circuit stated that "the meaning of the undefined term 'occurrence' is an open question as to which reasonable finders of fact could reach different conclusions." 345 F.3d at 190. In Newmont Mines, there were disputed issues of fact as to whether the collapse of two roofs constituted a single or two separate occurrences. See 784 F.2d at 137.

**C. Footnote Seven**

Finally, Defendant requests that the Court clarify that footnote seven is not an example of how coverage limits would apply to a single occurrence of employee dishonesty spanning two policy periods. Mem. at 2. Specifically, Defendant asserts that there is a contradiction between the Court's statement that "single occurrences spanning both [the 2007-08 and 2008-09 policy periods] are subject to a single coverage limit because recovery is authorized solely by 2008-09 policy" and the example provided in footnote seven illustrating how coverage limitations apply on a per contract

basis.[4] Mem. at 14.

The Court sees no contradiction. Footnote seven illustrates generally how a single occurrence spanning multiple policy periods would be recoverable under the coverage limitations of each of those policies. The discussion that Defendant claims contradicts footnote seven, on the other hand, was addressing the specific circumstance of a single occurrence spanning the 2007-08 and 2008-09 policy periods under the prior loss provision of the employee dishonesty extension. See Sept. Order at 14-16.[5] The Court found that the prior loss provision in the 2008-09 policy allowed recovery of losses occurring in the 2007-08 policy period. Id. at 16. Thus, an insured could recover for separate occurrences within the 2007-08 policy period and the 2008-09 policy period. "However, single occurrences spanning both Policy Periods are subject to a single coverage limit

---

[4] The example states that "[u]nder an identical policy with a $75,000 coverage limit, an insured who lost $150,000 in an occurrence of employee dishonesty—with $140,000 of those losses coming during the second policy period—could not pool the $75,000 coverage limitations to recover all $150,000 of its losses. Rather, the company could only recover $75,000 of the $140,000 loss sustained during the second policy period, resulting in a total recovery of $85,000." Sept. Order at 13 n.7.

[5] The prior loss provision extends coverage,

> (8) If you (or any predecessor in interest) sustained loss or damage during the period of any prior insurance that you could have recovered under that insurance except that the time within which to discover loss or damage had expired, we will pay for it under this Coverage Extension, provided: (a) This Coverage Extension became effective at the time of cancellation or termination of the prior insurance; and (b) The loss or damage would have been covered by this Coverage Extension had it been in effect when the acts or events causing the loss or damage were committed or occurred.
>
> (9) The insurance under paragraph (8) above is part of, not in addition to, the Limit of Insurance applying to this Coverage Extension and is limited to the lesser of the amount recoverable under: (a) This Optional Coverage as of its effective date; or (b) The prior insurance had it remained in effect.

Dkt. No. 58-8 at 94.

because recovery is authorized solely by the 2008-09 policy." Id.

## V. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendant's Motion (Dkt. No. 86) for reconsideration is **DENIED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED: October 15, 2015
Albany, NY

Lawrence E. Kahn
U.S. District Judge